UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

DEIRDRE SMALL and MALIKAH ALKEBULAN,

         Plaintiffs,

       - against -

NEW YORK CITY TRANSIT AUTHORITY,

         Defendant.

<u>MEMORANDUM AND ORDER</u>

CV 2003-2139 (SLT)(MDG)

- - - - - - - - - - - - - - - - - - X

Plaintiffs Deirdre Small and Malikah Alkebulan ("plaintiffs") brought this action asserting claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 ("Title VII"), and 42 U.S.C. § 1983, in addition to related claims under New York state law.  In May 2012, the parties entered into a settlement agreement for monetary and injunctive relief.  Plaintiffs now move for attorneys' fees for their counsel of record, Armani Baraka Scott and Lonnie Hart, and costs.  The parties have consented to my hearing and determining the motion.

<u>BACKGROUND</u>

Plaintiffs filed their complaint on May 2, 2003, asserting claims that defendant discriminated against them in their employment on the basis of their religion and gender.  Plaintiffs alleged that defendant removed them from passenger service as bus operators because they wore Muslim head coverings called khimars

and refused to wear a hat to cover their khimars.  Plaintiffs
further alleged that male Muslim bus operators were treated
differently because they were permitted to wear a head covering
called a kufi on duty.  Discovery proceeded under the supervision
of the late A. Simon Chrein, United States Magistrate Judge, who
originally set a fact discovery deadline of April 15, 2004 which
was extended a number of times.

On June 3, 2004, Mr. Hart and Mr. Scott commenced an action
on behalf of Gladys Muhammad (2004-cv-2294) and asserted
virtually identical claims of gender and religious discrimination
under federal and state law, as well as additional claims of
hostile work environment and race discrimination under Title VII.
A few days later, on June 7, 2004, a different attorney commenced
a similar action on behalf of Stephanie Lewis (2004-cv-2331).  In
September 2004, the Department of Justice ("DOJ") filed an action
(2004-cv-4237) for injunctive relief alleging that
defendants "selectively enforced uniform policies to target
Muslim and Sikh employees whose sincerely held religious beliefs
and practices require that they wear religious head coverings."
Complaint at ¶ 8.  The government specifically alleged that
plaintiffs, Ms. Muhammad, Ms. Lewis and Kevin Harrington, a
member of the Sikh faith, had been involuntarily transferred from
bus operator positions as a result of their refusal to comply
with uniform policies that conflicted with their sincerely held
religious beliefs.  Id. at ¶¶ 10, 11.

In March 2005, this Court assumed responsibility for

pretrial supervision of this case and the action was later
formally reassigned to me in April.  At a conference on April 12,
2005, this Court consolidated for discovery purposes the four
actions then pending and set a new discovery schedule.  Later in
2005, employees of the Sikh faith commenced two actions -- the
first by Mr. Harrington (2005-cv-3341), followed by a later suit
brought by Inderjit Singh and four other employees (2005-cv-
5477).  The Harrington and Singh actions were also consolidated
with the four actions.  On September 7, 2005, this Court
designated the DOJ action as the lead action in the consolidated
cases and the DOJ attorneys apparently undertook much of the
remaining discovery, except for discovery relating to the damage
claims of individual plaintiffs.

Counsel from the Department of Justice appeared at a
scheduled conference in this case on October 22, 2004 and all
other subsequent court proceedings in the consolidated actions.
The government attorneys apparently then took over primary
responsibility in completing discovery and conducted over 40
depositions, including reexaminations of a few witnesses deposed
earlier in this case by plaintiffs' counsel.

At a conference on October 4, 2006, the parties advised that
discovery was essentially completed.  Counsel also indicated that
they believed that all the individual cases could be settled if
the parties were successful in resolving the DOJ action.  See
minute entry for 10/4/06.  However, no resolution could be
reached and the defendant filed applications for a pre-motion

conference to discuss contemplated motions for summary judgment in each of the six consolidated cases.  See ct. docs. 130-135 (DOJ action).

Judge Townes later directed that briefing proceed only in the DOJ action and counsel for the United States and the defendant filed their submissions in connection with the motion on March 17, 2009.  Plaintiffs provided declarations in support of the Department of Justice's opposition to defendant's motion. On September 24, 2010, the Honorable Sandra L. Townes denied defendant's motion in its entirety.  See ct. doc. 221 in DOJ action.

The parties renewed efforts to settle the consolidated actions shortly thereafter.  Initially holding a number of joint settlement conferences with all the parties together, this Court later separated negotiations regarding injunctive relief from discussions regarding monetary claims of the individual plaintiffs.  Although consulting with other plaintiffs' counsel, counsel for the Department of Justice took the lead in negotiating the terms of a settlement for injunctive relief and this Court conducted a number of settlement conferences with counsel only in the DOJ action.  After an agreement in principle was reached for injunctive relief in the DOJ action to which the plaintiffs in individual actions consented, this court referred the individual plaintiffs to court annexed mediation.  The parties in this action and in the Harrington and Singh actions reached agreement on the amount of monetary relief for their

claims.

On May 30, 2012, the United States filed a motion for approval of a settlement agreement providing for prospective injunctive relief and monetary relief for eight individuals. On the same date, defendant filed virtually identical stipulations of dismissal in this and the Harrington and Singh actions which provided that "Counsel for the plaintiff, if they wish, may submit a motion to the Court for an award of reasonable attorney's fees within sixty (60) days of the date that this Stipulation is entered on the Court's docket . . . ." See ct. doc. 173; ct. doc. 93 (Harrington action). Plaintiffs followed with the instant motion for fees.

The parties in the Harrington action sought, and were granted, an extension of time to September 10, 2012 for the fee motion to explore "resolving the fee matter by agreement rather than by motion . . . ." See letter dated July 27, 2012 of Richard Schoolman, ct. doc. 96 (Harrington action). No motion was ever filed.

As part of the settlement in this action, plaintiffs are permitted to return to passenger service. In addition, and as part of the settlement in the DOJ action, the defendant agreed to adopt and maintain new uniform policies regarding headwear for bus operators. Under the new policy, bus operators are permitted to wear a khimar that is made of fabric in the Transit Authority approved plain, solid navy blue color, without covering it with a hat or attaching any logo to it. As to monetary relief,

defendant agreed to pay plaintiff Small $51,000 and plaintiff Alkebulan $46,000.

Throughout this litigation and before, plaintiffs' union, the TWU 100, filed grievances on their behalf challenging the same conduct that gives rise to this action. Plaintiffs' counsel participated in the hearings and mediation conferences related to those grievances.

DISCUSSION

I. <u>Prevailing Party Status</u>

A court may, in its discretion, award attorneys' fees to the "prevailing party" in a Title VII or section 1983 action. <u>See</u> 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 1988. There is a "presumption that successful civil rights litigants should ordinarily recover attorneys' fees unless special circumstances would render an award unjust." <u>Raishevich v. Foster</u>, 247 F.3d 337, 344 (2d Cir. 2001).

Defendant argues that plaintiffs are not entitled to attorneys' fees because they are not "prevailing parties." Ordinarily, to qualify as a "prevailing party," a party must have created a court ordered "material alteration of the legal relationship of the parties" through an enforceable judgment or consent decree. <u>See</u> <u>Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.</u>, 532 U.S. 598, 604 (2001). However, the <u>Buckhannon</u> analysis does not apply here since the parties expressly agreed to designate plaintiffs as "prevailing parties."

The settlement agreement should be interpreted according to principles of contract law. See Geller v. Branic Int'l Realty Corp., 212 F.3d 734, 737 (2d Cir. 2000). Courts will "give effect to the parties' intent as expressed in the unequivocal language they have employed" in the contract. See British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003).

The settlement agreement the parties negotiated and executed provides that "plaintiffs will be treated as 'prevailing parties' for the purpose of [an] award of attorneys' fees payable by the NYCTA." Ct. doc. 173-1 at 4, 5. The agreement does not reserve for defendant the right to argue that plaintiffs are not "prevailing parties." On the contrary, the agreement provides that "[t]he attorneys for Plaintiffs may apply to the Court . . . for an order awarding those attorneys reasonable attorneys' fees." Id. at 4. Given these terms, defendant is disingenuous in now claiming it had agreed to the language simply "to get the settlement 'done,'" even though counsel "doubted" that such language is enforceable as a "stipulation of law." Def.'s Mem. (ct. doc. 177) at 9. However defendant wishes to characterize this term of the stipulation, the fact remains it is bound by its agreement; it has not, and cannot, point to any authority for the proposition that parties are prohibited from agreeing that a defendant would pay plaintiffs' attorneys' fees in an amount to be determined by the court. See Fulmore v. Home Depot U.S.A., Inc., 2007 WL 2746882, at *2 (S.D. Ind. 2007) (interpreting

settlement agreement to provide for "prevailing party" status).
Therefore, the Court will enforce the parties' agreement and
treat plaintiffs as "prevailing parties" for purposes of the
instant motion.

Defendant's position is particularly troubling in light of
the absence of a fee application by plaintiff's counsel in the
Harrington and Singh actions.  In both actions, counsel
stipulated to an extension for submission of an application in an
attempt to resolve the amount of fees.  This Court assumes that a
resolution was indeed reached without dispute over the issue that
the plaintiffs were not prevailing parties, as has happened here.

II.  Amount of Reasonable Attorneys' Fees

The standard method for determining the amount of reasonable
attorneys' fees is "the number of hours reasonably expended on
the litigation multiplied by a reasonable hourly rate," or a
"presumptively reasonable fee."  Hensley v. Eckerhart, 461 U.S.
424, 433, 1940 (1983); Millea v. Metro-North R.R. Co., 658 F.3d
154, 166 (2d Cir. 2011); Arbor Hill Concerned Citizens
Neighborhood Ass'n, 522 F.3d 182, 188-90 (2d Cir. 2008); see also
Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551-53 (2010)
(discussing lodestar methodology in determining attorneys' fees
to be awarded to prevailing party).  In reviewing a fee
application, the district court must examine the particular hours
expended by counsel with a view to the value of the work product
of the specific expenditures to the client's case.  See Lunday v.

City of Albany, 42 F.3d 131, 133 (2d Cir. 1994); DiFilippo v.

Morizio, 759 F.2d 231, 235 (2d Cir. 1985).  If any expenditure of

time was unreasonable, the court should exclude these hours from

the calculation.  See Hensley, 461 U.S. at 434; Lunday, 42 F.3d

at 133.  The court should thus exclude "excessive, redundant or

otherwise unnecessary hours, as well as hours dedicated to

severable unsuccessful claims."  Quaratino v. Tiffany & Co., 166

F.3d 422, 425 (2d Cir. 1999).  A party seeking attorneys' fees

bears the burden of supporting its claim of hours expended by

accurate, detailed and contemporaneous time records.  New York

State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136,

1147-48 (2d Cir. 1983).

A reasonable hourly rate is "the rate a paying client would

be willing to pay," "bear[ing] in mind that a reasonable paying

client wishes to spend the minimum necessary to litigate the case

effectively."  Arbor Hill, 522 F.3d at 190; see Perdue, 559 U.S.

at 551; Bergerson v. N.Y. State Office of Mental Health, Central

N.Y. Psychiatric Center, 652 F.3d 277, 289 (2d Cir. 2011).  The

reasonable hourly rates should be based on "rates prevailing in

the community for similar services of lawyers of reasonably

comparable skill, experience, and reputation."  Cruz v. Local

Union No. 3 of IBEW, 34 F.3d 1148, 1159 (2d Cir. 1994) (citing

Blum v. Stenson, 465 U.S. 886, 894 (1984)); see Perdue, 559 U.S.

at 551.  Determination of the prevailing market rates may be

based on evidence presented or a judge's own knowledge of hourly

rates charged in the community.  Farbotko v. Clinton Cty. of

N.Y., 433 F.3d 204, 209 (2d Cir. 2005).  The "community" is
generally considered the district where the district court sits.
See Lochren v. Cty. of Suffolk, 344 Fed. App'x 706, 708 (2d Cir.
2009); Simmons v. N.Y. City Transit Auth., 575 F.3d 170, 174 (2d
Cir. 2009).

Plaintiffs request fees in the amount of $634,266.50 based
on 1,812.19 hours of work billed at $350 per hour.  Defendant
argues that plaintiffs' request is based on an unreasonable
number of hours and a higher than appropriate rate.

A.  Reasonable Hourly Rate

The "range of 'reasonable' attorney fee rates varies
depending on the type of case, the nature of the litigation, the
size of the firm, and the expertise of its attorneys."  Siracuse
v. Program for the Dev. of Human Potential, 2012 WL 1624291, at
*30 (E.D.N.Y. 2012); Hugee v. Kimso Apartments, LLC, 852 F. Supp.
2d 281, 298-300 (E.D.N.Y. 2012) (size of the firm a
consideration).  The range of rates that courts in this district
have determined to be reasonable in civil rights cases has varied
from judge to judge.  On the lower end, courts have approved
partner rates of between $300 and $400 per hour.  E.g., Struthers
v. City of New York, 2013 WL 5407221, at *8 (E.D.N.Y. 2013)
(awarding rate of $350 per hour for solo practitioner); Colon v.
City of New York, 2012 WL 691544, at *21 (E.D.N.Y. 2012)
(approving rate of $350 per hour for solo practitioner);
Siracuse, 2012 WL 1624291, at 30 (approving rate of $400 per hour
for founding partner of firm and $350 per hour for solo

-10-

practitioner); Gutman v. Klein, 2009 WL 3296072, at *2 (E.D.N.Y. 2009) (approving rates of $300-$400 for partners, $200-$300 for senior associates and $100-$200 for junior associates); see also Konits v. Karahalis, 409 Fed. App'x 418, 422-23 (2d Cir. 2011) (affirming holding that the prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour). Courts have recognized slightly higher ranges in this district of "$300-$450 per hour for partners, $200-$300 per hour for senior associates, and $100-$200 per hour for junior associates." Struthers, 2013 WL 5407221, at *7; Hugee, 2012 WL 1096086, at *11-*13 (citations omitted) (citing cases). Another court has recently observed that "reasonable fees in this district vary from $200 to $375 per hour for partners and $100 to $295 per hour for associates." Penberg v. HealthBridge Mgmt., 2011 WL 1100103, at *6-*7 (E.D.N.Y. 2011).

Setting aside the variation in the range of rates awarded, the actual hourly rate that many courts have awarded partners and solo practitioners in civil rights cases have most often been in the $300 per hour range. See, e.g., Abel v. Town Sports Int'l, LLC, 2012 WL 6720919, at *28 (S.D.N.Y. 2012)[1] (awarding $275 per

---

[1] Although a few of the cases cited herein involve rates for the Southern District of New York, courts have recognized that the prevailing market rates for the Eastern District are not higher. See Simmons, 574 F.3d at 177 (noting that "competent counsel in the Eastern District would produce [a comparable result] for less . . . money" than Southern District counsel).

hour to counsel who graduated law school in 1999 and had no prior employment litigation experience); Brown v. Starrett City Assocs., 2011 WL 5118438, at *5 (E.D.N.Y. 2011) (awarding $300 per hour to counsel with 12 years' litigation experience, 7 of those in civil rights"); Rodriguez v. Queens Convenience Deli Corp., 2011 WL 4962397, at *6 (E.D.N.Y. Oct. 18, 2011) (awarding $300 per hour to solo practitioner with 9 years of experience); GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yereim, 2009 WL 3241757, at *3-*4 (E.D.N.Y. Sept. 30, 2009) (awarding $275 per hour to partners at a small firm with over 25 years of litigation experience in a case that was not "so complicated as to warrant application of a higher-than-usual fee").

As Judge Gleeson noted in Hugee, "[t]he highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields." 2012 WL 1096086, at *13 (citing cases); see Struthers, 2013 WL 5407221, at *8 (citing Hugee). The cases in which rates were awarded at the high end have ranged from $350 to $450 per hour for attorneys having considerably more experience than plaintiffs' counsel here. See Siracuse, 2012 WL 1624291, at *30 (awarding $350 per hour to solo practitioner who graduated law school in 1995 and practiced almost exclusively in employment law and $400 per hour to partner who graduated in 1977); Colon, 2012 WL 691544, at *21 (awarding $350 per hour to solo practitioner with over 20 years

-12-

of experience); <u>Thorsen v. County of Nassau</u>, 2011 WL 1004862, at
*5-6 (E.D.N.Y. 2011) (awarding $425 per hour to "well known labor
and employment attorney with 26 years of experience"); <u>Luca v.
County of Nassau</u>, 698 F. Supp. 2d 296, 301 (E.D.N.Y. 2010)
(awarding rate of $400 per hour to partner with over 25 years of
experience in civil rights cases and recognized as an authority
in his specialty); <u>Lochren v. County of Suffolk</u>, 2010 WL 1207418,
at *3 (E.D.N.Y. 2010) (awarding $450 per hour for partner with 49
years of experience); <u>Wong v. Yoo</u>, 2010 WL 4137532, at *2
(E.D.N.Y. 2010) (awarding $375 per hour to a solo practitioner
with thirty years experience, mostly in civil rights law); <u>Olsen
v. County of Nassau</u>, 2010 WL 376642, at *4 (E.D.N.Y. 2010)
(awarding $375 per hour rate for partner with 14 years of
experience in civil rights and employment discrimination cases);
<u>cf.</u> <u>Menghi v. Hart</u>, 745 F. Supp. 2d 89, 112-13 (E.D.N.Y. 2010)
(awarding requested rate of $295 per hour to solo practitioner
with over 20 years experience in a Section 1983 and Drivers'
Privacy Protection Act case that was "labor intensive").

Mr. Scott and Mr. Hart are 1998 law school graduates.  Mr.
Scott exclusively practiced criminal litigation for at least his
first two years after law school and then opened his own law firm
in 2002 with a concentration on civil and criminal litigation.
Although Mr. Scott states that he "has successfully litigated
employment discrimination actions," he does not provide any
details as to the breadth of his experience in this area, only
specifically mentioning one such case he litigated in 2006.  When

-13-

this action was filed in 2003, Mr. Scott had been practicing
civil litigation for, at most, 2 years.  Mr. Hart practiced
exclusively criminal litigation up until 2002 when he entered
private practice.  A review of Mr. Hart's firm's website confirms
that his practice is heavily focused on criminal defense and
related civil rights actions.  See www.lonniehartpc.org.[2]  Mr.
Hart cites only the 2006 employment discrimination case he
litigated with Mr. Scott as evidence that he has any experience
in this area of the law.

Defendant argues that an award of attorneys' fees at the
rate of $100 per hour would be "generous."  By way of comparison,
defendant cites the difficult job market for attorneys, defense
counsel's own hourly salary and the hourly salaries of the
plaintiffs themselves.  Defendant's hyperbole aside, such
comparisons are not useful in determining a reasonable fee.

Courts must keep in mind that "a 'reasonable' fee is a fee
that is sufficient to induce a capable attorney to undertake the
representation of a meritorious civil rights case."  Perdue, 559
U.S. at 552.  Counsel should be compensated at hourly rates in
line with the prevailing rates in this district and which a
reasonable paying client would be willing to pay.  Importantly,
neither attorney mentions rates that they typically charge
regular, paying clients.  Thus, there is no evidence that clients

---

[2] A court may take judicial notice of a website.  See
United States v. Akinrosotu, 637 F.3d 165, 168 (2d Cir. 2011)
(taking judicial notice of a website).

pay the requested rates for the kind of services rendered on behalf of plaintiffs.  See Hyeon Soon Cho v. Koam Med. Servs. P.C., 524 F. Supp. 2d 202, 208 (E.D.N.Y. 2007).  Nor does counsel disclose what fees plaintiffs have paid or whether the retainer agreement provides for an hourly rate or a contingency fee. After considering counsel's experience, I find, based on my knowledge of billing rates in this district, that a reasonable rate for Mr. Scott and Mr. Hart is $300 per hour.  Neither attorney has reached the stature of other civil rights attorneys with 20 or more years of experience who were awarded higher rates.  Nor have these attorney demonstrated in their interaction with the Court any specialized knowledge or skill in civil rights and employment law.  Were a client willing to pay a higher rate comparable to what has been requested, the client could have retained the services of attorneys with considerably greater experience.

    B.    Reasonable Number of Hours

     Defendant argues that the amount of time counsel spent on this case is grossly excessive.  I agree.  Plaintiffs' counsel claims to have expended 1,812.19 hours prosecuting this case. Although this Court understands that counsel conducted extensive discovery over the course of three years before defendant filed its summary judgment motion, 1,800 hours is an enormous amount of time for a case that did not go to trial and did not involve extensive motion practice.  No reasonable client would be willing

to pay attorneys' fees based on over 1,800 hours for the work purportedly performed by counsel in this case. After careful review of the time records and based on my familiarity with this action, I find that a substantial reduction is warranted, as discussed below.

Defendant contends that fees are not warranted for several categories of time spent by plaintiffs' counsel. First, counsel billed at least 93.35 hours on work relating to union grievances filed by plaintiffs arising out of the same conduct as this lawsuit. Section 2000e-5(k) limits the work for which fees are recoverable to "any action or proceeding." The Supreme Court has held that mandatory administrative proceedings are included within that definition. See N.Y. Gaslight Club, Inc. v. Carey, 447 U.S. 54, 71 (1980). On the other hand, fees for time spent on optional administrative proceedings are not recoverable unless the proceeding is "both useful and a type necessary to advance the civil rights litigation to the stage it reached before settlement." Webb v. Bd. of Educ. of Dyer Cty., Tenn., 471 U.S. 234, 243 (1985).

Plaintiffs' counsel argues that they were required to participate in the grievance process "in order to protect Plaintiffs' interest and preserve their rights" related to this litigation. However, the union grievance proceedings were not a prerequisite to the filing of plaintiffs' Title VII action in federal court. See Manders v. State of Okl. ex rel. Dept. of

-16-

<u>Mental Health</u>, 875 F.2d 263, 267 (10th Cir. 1989) (denying fees for optional internal grievance procedure in Title VII action); <u>Summerville v. TWA, Inc.</u>, 1999 WL 33134345, at *3 (E.D. Mo. 1999) (disallowing attorneys' fees for arbitration proceedings between union and defendant); <u>Carney v. Runyon</u>, 848 F. Supp. 153, 157 (D. Kan. 1994) (disallowing fees for services related to union grievance proceeding). Rather, the grievance process was an optional separate mechanism which proceeded concurrently with this litigation. Importantly, counsel does not offer any argument that the work they performed in grievance proceedings was in any way useful to the advancement of this case. <u>Cf.</u> <u>Keenan v. City of Philadelphia</u>, 983 F.2d 459, 474 (3d Cir. 1992) (affirming grant of attorneys' fees for time spent on labor arbitration proceeding because transcripts of arbitration testimony and arbitration decision was read to jury); <u>Gilmore v. Bergin</u>, 1998 WL 1632526, at *8 (D. Conn. 1998) (awarding fees for time counsel spent reviewing transcripts and tapes of administrative proceeding which was useful to prepare for litigation). Tellingly, one of the billing entries is for a 15 minute phone call with plaintiff Alkebulan "regarding TWU 100 grievance scheduled for 9/14/04 at 11 AM" that occurred almost two months after this case was dismissed. <u>See</u> Scott entry for 7/26/12. Since the grievance process was not a precondition to bringing suit and the resulting settlement reached, and counsel has not otherwise demonstrated that the work done on the grievance benefitted the litigation, fees for the 93.35 hours

-17-

that defendant spent on the grievance process will be disallowed.

Plaintiffs' counsel seeks fees for 14 hours spent giving media interviews and consulting with a publicist, most of which occurred in 2003. Contrary to defendant's argument, time spent giving press conferences and performing other public relations work is not categorically uncompensable. However, courts generally require that such work be "directly and intimately related to the successful representation of [the] client." <u>See Davis v. City and County of San Francisco</u>, 976 F.2d 1536, 1545 (9th Cir. 1992); <u>see</u>, <u>e.g.</u>, <u>Ansoumana v. Gristede's Operating Corp.</u>, 2004 WL 504319, at *3 (S.D.N.Y. 2004) (time spent attracting media coverage was necessary to reaching potential plaintiffs in class action); <u>Rodriguez ex rel. Kelly v. McLoughlin</u>, 84 F. Supp. 2d 417, 425 n.7 (S.D.N.Y. 1999) ("informing the public about court proceedings is often necessary to fully vindicate the public interest implicated by the case"). Plaintiffs' counsel did not respond to defendant's argument and failed to demonstrate why the public relations work was necessary or how it assisted counsel in achieving the settlement filed nine years later in this case. Therefore, fees for the 14 hours spent on media activities is disallowed.

Defendant argues that plaintiffs' counsel should not be awarded fees for time spent reading books entitled "Islam Our Choice, Portraits of Modern American Muslim Women" and "Woman and Gender in Islam." Plaintiffs respond that the 54.5 hours were

spent researching the important issue of Muslim attire in a modern society. As defendant correctly points out, the key issue in this case was whether the alleged burden the government placed on plaintiffs' free exercise of religion relates to a "sincerely held belief" notwithstanding the objective validity of those beliefs. See Ford v. McGinnis, 352 F.3d 582, 588-91 (2d Cir. 2003). Therefore, the practices of Muslim women generally and the views of religious authorities are not relevant to whether the plaintiffs' beliefs were "'sincerely held and in the individual's own scheme of things, religious.'" Id. (quoting Fifth Ave. Presbyterian Church v. City of N.Y., 293 F.3d 570, 574 (2d Cir. 2002)). In any event, the time spent is far more than warranted for obtaining any necessary background information. I disallow fees for 54.5 hours conducting this background research.[3]

Defendant contends that time spent relating to Dr. Beverly McCloud, who plaintiffs disclosed as a potential expert, should be disallowed since Dr. McCloud was never made available for deposition. The fact that plaintiffs' counsel decided not to use an expert to testify does not preclude them from recovering attorneys' fees for time spent working with her. See Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1254 (10th Cir. 1992); United Partition Sys., Inc., 95 Fed. Cl. 42, 59 (Fed. Cl. 2010).

---

[3] Although the Court agrees with defendant that fees for this and certain other work should be disallowed, the Court independently calculated the amount of time spent on those tasks and reached a different total than defendant.

Although plaintiffs ultimately decided not to use Dr. McCloud as a testifying expert, they state that she "provided valuable background information."  Without more information about the subject matter of Dr. McCloud's retention by plaintiffs, the Court cannot determine whether the considerable time counsel spent was reasonable.  Since plaintiffs have failed to meet their burden of justifying the time expended, I disallow fees for 16.55 hours spent concerning Dr. McCloud.

Defendant argues that the time plaintiffs spent defending against motions to compel interrogatory responses, which ultimately resulted in sanctions being imposed jointly against plaintiffs and their counsel, should be disallowed.  In November 2005, defendant moved to compel plaintiffs to respond to interrogatories asking whether they consulted with a religious advisor about the propriety of wearing a khimar with an employer provided logo, badge or pin.  Plaintiffs had objected on various grounds and did not provide a substantive response.  This Court granted defendant's motion to compel on January 12, 2006 and required a response.  <u>See</u> ct. doc. 92.  On February 13, 2006, defendant moved to dismiss the complaint for plaintiffs' failure to comply with this Court's January 12 order.  On February 17, 2006, plaintiffs responded affirmatively to whether they consulted with a religious advisor, but referred to the testimony of a non-party witness as to what advice plaintiff received.  After further letters were exchanged between the parties, plaintiffs changed their answer to the interrogatory and denied

that they had sought religious advice on the issue.  On April 19,
2006, this Court granted defendant's motion and imposed sanctions
of $250 jointly on plaintiffs and their counsel.  Noting concern
that the plaintiffs had changed their answer belatedly, this
Court found that plaintiffs unreasonably failed to respond to
discovery, which resulted in multiple motions that would not have
been necessary if plaintiffs had responded in good faith in the
first instance.  <u>See</u> ct. doc. 120.  The Court further denied
plaintiff's motion for reconsideration of the order imposing
sanctions.  <u>See</u> ct. doc. 123.  I find that it would be
unreasonable to impose fees on defendant for the time plaintiffs
spent opposing defendant's discovery motions, especially since
plaintiffs were found not to have acted in good faith.  <u>See</u>
<u>Gunawan v. Sake Sushi Restaurant</u>, 2012 WL 4369754, at *13
(E.D.N.Y. 2012) (denying plaintiff fees for time spent litigating
unsuccessful summary judgment motion); <u>Andersen v. Sotheby's,</u>
<u>Inc.</u>, 2006 WL 2637535, at *5 (S.D.N.Y. 2006) (denying plaintiff
fees for unsuccessful motion seeking de novo standard of review).
Therefore, I deny plaintiffs' request for fees for the 7.5 hours
plaintiffs' counsel spent on this discovery issue.

Similarly, counsel claimed for time spent on other discovery
motions decided against the plaintiffs.  After counsel for
defendant sought a protective order to quash a deposition
subpoena of Lawrence Reuter, then President of the Transit
Authority, Judge Chrein ordered that:  "Unless plaintiffs'
counsel can demonstrate Mr. Reuter has some individualized

knowledge of this case that could not be satisfactorily obtained
from a more subordinate office, the court shall grant the
requested protective order . . . ."  When plaintiffs persisted
with a further submission, Judge Chrein granted defendant's
request for a protective order.  <u>See</u> ct. docs. 27, 29, 20, 32,
33.  Mr. Scott billed 6.65 hours for time spent reading the short
submissions and drafting a response, which includes an additional
hour on October 4, 2004 spent reading a two page affidavit from
Mr. Reuter that Judge Chrein had required defendant to submit.  I
thus disallow 6.45 hours of the time claimed by Mr. Hart, but
will not exclude .2 hours for reading the Reuter affidavit, which
was more than enough time for that task.

In addition, the Court granted two other motions to compel
brought by defendant for discovery that plaintiffs were not
justified in opposing.  First, defendant moved to compel Ms.
Small, who had her own expert, to submit to a mental health
examination which Judge Chrein granted by order filed on January
6, 2005 (ct. doc. 56).  This Court later granted a motion to
compel supplemental depositions of both plaintiffs by electronic
order on January 9, 2006 as to their consultation with a
religious expert regarding a new NYCTA policy that had occurred
after their original depositions.  Since Mr. Scott billed 2.75
hours for time spent on the first motion and Mr. Hart billed 4.5
hours of time for <u>reading</u>[4] the papers as to the second motion, I

---

[4] The opposition was filed by DOJ attorneys.

disallow 7.25 hours of time charged.

Defendant also argues that the 22.5 hours Mr. Hart spent on "[c]omputation of billables and preparation of billing statement" and the 25.5 hours spent by Mr. Scott on "[c]omputer computation of billable hours" is unreasonable. One possible explanation for this time is that, as Mr. Scott admitted, he recorded time "by hand, on pre-printed forms and transferred them to a computerized fee log when needed to support this fee application."[5] Scott Aff. (ct. doc. 175) at ¶ 14, 15. On the other hand, Mr. Hart states that "[a]ll of the billing records were kept contemporaneously in a computer database with the work as it was performed."[6] Regardless, even if counsel performed the

---

[5] This Court is skeptical of the accuracy of the records created. Mr. Scott's records reflect 2 identical entries for fees in the amount of $787.50 for a 10/22/04 conference before Magistrate Judge Chrein. I assume one entry is a clerical error. Similarly, Mr. Scott claimed the same work in two different dates for reading an order by me regarding taking over the case. See entries for 11/29/04 and 3/4/05. What is troubling about the first entry is that I had no involvement in this case in 2004.

[6] This Court also has concern whether Mr. Hart truly made all entries contemporaneously. This Court would assume that the date of each entry would be correct. However, the records contain an entry that Mr. Hart made on March 7, 2003 that he "[r]ead/review letter from Magistrate Go re: EDNY ...," a time when I had no involvement in the case. In addition, Mr. Hart charged for time spent on January 4, 2004 for the deposition of Jennifer Sinclair, but entered on January 20, 2004, two weeks later, time for "[p]rep for Sinclair deposition." To add to the confusion, Mr. Scott billed time for preparing for that deposition on January 20, 2004 and for attending the deposition on the following day. There are many similar instances of billing entries dated long after it is likely that the actual work reflected therein would have been performed based on the corresponding docket entry.

(continued...)

administrative task of transferring handwritten notes into a
computer database, it should not have taken more than a few hours
and that time should not be billed at regular attorney rates.  It
is grossly excessive for counsel to spend 48 hours compiling
billing records in support of their motion for fees.  Therefore,
fees for the time spent on this aspect of their motion will not
be awarded.

In addition to these categories for which attorneys' fees
will be disallowed entirely, further reductions in the fees
requested are necessary because of excessive time billed.

Most of counsel's time entries and virtually all of Mr.
Hart's entries are billed in increments of .25 hour.  There are
countless entries for .25 hour or more spent reading short court
filings consisting of a one or two sentence electronic order or
notice or equally short document addressing administrative
matters such as a notice of appearance, scheduling a conference,
granting a request for an extension of time or notifying the
parties that the case had been reassigned to a different judge.
See, e.g., Scott entries on 11/29/04, 12/9/04 (read scheduling
order), 3/4/05 (read three sentence electronic order), 3/7/05

---

[6](...continued)
To be sure, Mr. Hart's entry for September 30, 2005 for
17 hours for 138 e-mails from July 1, 2005 through that date
clearly was not entered contemporaneously as the work was
performed.  He repeated with similar combined entries at the
end of subsequent quarters for emails.  See, e.g., 12/31/05
entry for 17 hours spent on 138 emails; 3/31/06 entry for 6.3
hours spent on, again, 138 emails; 6/30/06 entry for 11.2
hours on 102 emails.

(status conference order), 10/17/05 (one sentence scheduling order), 11/4/05 (.5 hour to read consent motion for extension and order) and 12/15/05 (.5 hour to read two short electronic orders regarding scheduling); Hart entries on 5/11/06 (scheduling order), 9/7/06 (.5 hour to read notice regarding mediation), 4/25/07 (.5 hour to read pre-motion conference scheduling order), 12/7/07 and 12/27/07 (read new counsel's notice of appearance), 7/3/08 (read order for leave to file excess pages), 10/24/08 (read order granting extension), 10/28/08 (read one paragraph stipulation of dismissal), 5/21/09 and 6/3/09 (two entries for .25 hour each regarding change in government counsel). These tasks should have been billed at .1 hour if at all. A particularly striking example is Mr. Hart's entry on June 15, 2006 of one hour spent to read "minutes for discovery hearing on 6.13.06 re: Lewis case." The minute entry contained three sentences. Also, on April 27, 2004, Mr. Hart billed one hour to reading a letter from defendant that consisted of 3 sentences. On April 14, 2005, Mr. Hart billed .5 hour to read a 2 page order to show cause that is clearly not related to this case and apparently had been filed by the Clerk's Office in the DOJ action in error. These time entries are emblematic of what can, at best, charitably be described as a lack of billing judgment that infects the billing records submitted.

Similarly, entries for larger amounts of time often were for tasks that should not have taken even half that amount of time. For example, Mr. Hart billed over 35 hours for reading the

summary judgment papers in the DOJ action after it had been filed and an additional 4.5 hours for reading the Court's decision on the motion. There is no reason to devote so much time to reading submissions right after a motion is fully briefed and submitted, and no rational explanation for spending 12.5 hours doing so, as Mr. Hart claimed for March 21, 2009. Some of the documents filed which Mr. Hart claimed took at least one hour to read were very short. See, e.g., 1.5 hours to read the 11 page affidavit and attachment of Charles Glasgow (ct. doc. 186) and the same amount of time to read the 7 page affidavit of Cordell Rogers (ct. doc. 189). Mr. Scott billed 5 hours on November 3, 2004 for drafting a letter to "EDNY clerk regarding consolidation of related cases." No such letter appears on the docket for this case, though counsel for the United States had filed such a letter request in the DOJ action on November 11, 2004. See ct. doc. 5. Mr. Scott has 3 entries totaling 1.5 hours for reading a one sentence order scheduling a conference before me. See Scott entries for 3/4/05 and 3/7/05. Mr. Scott billed 5.5 hours for reading a motion to compel discovery in a related case but there was no motion to compel filed in any of the cases around the time of this billing entry. See Scott entries for 2/2/07. Mr. Hart billed 1.5 hours for reading a one page request for an extension on consent and the one sentence order from the court granting the extension. See Hart entries for 12/12/05. On December 9, 2010, Mr. Hart billed one hour for reading a one paragraph response of the United States to defendant's request to adjourn a conference.

Mr. Hart billed one hour for reading the minute entry, which consisted of 2 lines, following a conference held on January 13, 2012. These are just a _few_ examples of the excessive billing for discrete tasks that permeate the records submitted.

The distorting effect of using minimum increments of 15 minutes for each entry was amplified by the practice of both attorneys to make a separate entry for each task performed on the same day, however minor the work. Thus, entries for .25 hour were made for reading identical or similar documents in different cases or different documents in this case, which cumulatively should have taken fewer than 15 minutes and ended up being billed for far more. For example, on April 12, 2005, Mr. Hart made four separate entries of .25 hour each, for a total of 1 hour for reading four notices regarding assignment of magistrate judges, two in the Lewis action and two in this action. The notices each consisted of two short sentences entered on the docket sheets. Similarly, Mr. Scott made two separate entries for March 7, 2005, one for .25 hour and the other for one hour, for reading an order scheduling a conference. The scheduling orders, which were filed in the four consolidated cases then pending, were routine and similar and should not have taken 1.25 hours to read, as billed. As a last example, Mr. Hart made four separate entries for reading letters on July 9, 2007 submitted by defendant on July 9, 2007 which addressed issues raised by Judge Townes at a pre-motion conference held in June. The letters covered overlapping issues and ranged from three to six pages. Mr. Hart billed one

hour for reading each letter when, again, the hour billed for a single entry should have been sufficient for this task.

The attorneys also billed far more time for their attendance at conferences before me than my chambers recorded for each conference. For example, Mr. Scott billed 3 hours for a conference held on April 12, 2005 while my records show that the conference lasted approximately 45 minutes. Mr. Scott billed 1.75 hours for a conference held on October 4, 2006 which my records reflect took approximately 20 minutes. Mr. Scott billed 2.75 hours for a conference held on November 3, 2010 that my records show lasted approximately 55 minutes. Most troubling, Mr. Scott billed 1.75 hours for a settlement conference on December 13, 2010. However, the Court did not hold a conference on that day. A conference had been scheduled for December 13, 2010 but was adjourned to January 24, 2011. See electronic order dated 12/8/10. Mr. Scott also billed 2.25 hours for his attendance at the January 24, 2011 conference which my records show lasted only 40 minutes. Mr. Hart billed 1.5 hours for a conference held on January 13, 2012 which my records show took 5 minutes. Even if some of the increase in time relating to in-person conferences are due to the time Mr. Scott spent traveling to court from his office in New Jersey, travel time should not be billed at an attorney's regular rate. Travel time is usually compensated at 50 percent of counsel's hourly rate. See Toussie v. Cty. of Suffolk, 2012 WL 3860760, at *7 (E.D.N.Y. 2012); Hugee, 2012 WL 1096086, at *14.

Plaintiffs' counsel collectively billed over 225 hours for reading deposition transcripts. Since there was no summary judgment motion filed or trial held, it was unnecessary for counsel to spend so much time studying deposition testimony.

Although counsel states that they "did not bill for any time expended on the related Muhammad v. NYCTA case," since these cases were consolidated for discovery purposes, much of the time spent on discovery benefitted plaintiffs in both cases. The time spent attending a court conference or a deposition that related to all the actions should not be attributed only to plaintiffs Small and Alkebulan. There is no indication that counsel has made any adjustment for this overlap. Since attorneys cannot bill two clients for the same work, there must be some allocation among the plaintiffs for the work that their attorneys performed for their common interest. In fact, Mr. Hart did include, perhaps inadvertently, 1.5 hours spent on work relating solely to the Muhammad case and this time will be disallowed. See Hart entries for 7/15/04 and 7/9/07.

Defendant argues that plaintiffs should not recover fees for time spent communicating with attorneys in the other related cases or reading correspondence and documents related to those other cases. However, since the related cases were consolidated for discovery purposes and raised several common issues, it was reasonable for plaintiffs' counsel in this case to coordinate with the attorneys in the related cases and to monitor

developments in those cases.  Indeed, plaintiffs were specifically mentioned in the complaint filed in the DOJ action as examples of employees who were discriminated against and, as defendant points out, the injunctive relief agreed to in the DOJ action benefitted Small and Alkebulan.  Complaint filed in 04-cv-4237 at ¶¶ 10, 11.

Although counsel states that they avoided duplication by dividing the work for which each attorney was responsible, the billing records reflect some degree of duplication.  For example, although Mr. Scott was to be primarily responsible for drafting documents, Mr. Hart billed 4.5 hours for editing the complaint. See entries for 4/28/03, 4/30/03.  In addition, both attorneys attended many court conferences and depositions when attendance by two attorneys would be unnecessary.  See Hart and Scott entries for 8/7/03, 12/4/03, 12/11/03, 12/12/03, 3/10/04, 3/24/04 and 10/22/04.  There was also time billed specifically for strategy sessions between the attorneys.  See, e.g., Hart entries for 3/20/05, 10/5/04 and 7/31/07 and time for e-mail correspondence between the attorneys.

Counsel also billed time at their regular attorney rates for administrative tasks that could have been completed by a paralegal or clerical staff at reduced rates.  For example, Mr. Scott billed 2.75 hours for filing the complaint and an affidavit of service of the complaint.  See Scott entries for 5/2/03 and 5/6/03.  Mr. Scott billed almost 30 hours for reviewing documents

produced by defendant to the United States and cross-referencing them against documents that had already been produced in this case. See Scott entries for 9/5/06, 9/6/06, 9/7/06, 9/8/06, 9/10/06, 9/17/06. Both attorneys spent considerable time annotating deposition transcripts which could have been performed by an attorney billing at a much lower rate.

Mr. Hart's use of "block billing" to group together entries regarding email correspondence renders it impossible to evaluate the reasonableness of the time spent. For example, one entry for 13.7 hours states "E-mail correspondence with clients, defense attorneys, plaintiff attorneys, USDOJ, and other case related individuals from 10.1.06 through 12.31.06. 137 e-mails." See Hart entry for 12/31/06. Mr. Hart alone billed over 180 hours for such e-mail correspondence.

In considering an application that includes excessive hours, a court "has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998). Although some courts have denied fees entirely where a fee request is "outrageously excessive," see Toussie, 2012 WL 3860760, at *7 (citing cases), I decline to do so. Forfeiture of fees would be too extreme a penalty, notwithstanding the patently inflated hours claimed by counsel. Given the importance of the rights at issue in this case, this Court is appreciative of the fact that Mr. Hart and Mr. Scott

undertook to vindicate plaintiffs' rights.  They engaged in a
litigation which likely required more work and expertise than
these two young attorneys expected and they proceeded to pursue
this action alone until the appearance of attorneys from the
Department of Justice.  In the 13 months before DOJ attorneys
appeared, Mr. Hart and Mr. Scott conducted discovery, propounded
and responded to requests, took  sixteen depositions,[7] and
handled discovery disputes with the defendant.

However, this Court cannot award fees based on the time
claimed or even for a number closely approaching 1,800 for the
reasons discussed above.

Certain of the hours discussed above should be deducted
entirely for various reasons, which amount to a reduction of
249.1 hours.  In order to account for the excessive hours billed
generally, this Court will make an across the board reduction to
the remainder of entries.  This is an efficient method of
addressing the myriad of problems with counsel's entries rather
than "'making minute adjustments to individual time entries.'"
See Maldonado v. La Nueva Rampa, Inc., 2012 WL 1669341, at *14

---

[7]  In contrast to the large number of hours claimed
elsewhere, Mr. Hart, who appeared at all but one deposition,
billed a total of only 31 hours for taking the depositions,
plus one to two hours of preparation beforehand.  Mr. Scott
appeared at a number of the depositions and claimed time in a
similar, but not always, identical amount of time.  As
discussed above, the double staffing is unwarranted for the
depositions absent explanation.  Also, Mr. Scott made two
entries for the deposition of Steve Vecchione, one for 1.75
hours on 5/10/04 and 1.5 hours on 6/15/04.  There is no
indication that the deposition was continued to a second day.

(S.D.N.Y. 2012) (quoting <u>Chan v. Sung Yue Tung Corp.</u>, 2007 WL
1373118, at *5 (S.D.N.Y. 2007)); <u>see also</u> <u>Lunday v. City of</u>
<u>Albany</u>, 42 F.3d 131, 134 (2d Cir. 1994) (court not required to
"set forth item-by-item findings concerning what may be countless
objections to individual billing items").  Considering that the
billing entries submitted show, at best, gross negligence in the
care taken to maintain accurate records, and at worst, bad faith,
a significant reduction is appropriate.  I find that the
excessive hours billed by counsel warrant a 60% reduction in the
remaining number of hours claimed.  <u>See</u> <u>Guardians Ass'n of the</u>
<u>Police Dep't of N.Y. v. City of N.Y.</u>, 133 Fed. App'x 785 (2d Cir.
2005) (affirming reduction of 80% of hours claimed); <u>Maldonado</u>,
2012 WL 1669341, at *14 (applying 70% reduction in hours billed);
<u>Mendez v. The Radec Corp.</u>, 907 F. Supp. 2d 353, 359 (W.D.N.Y.
2012) (applying 70% reduction in number of hours); <u>Suchodolksi</u>
<u>Assocs. v. Cardell Fin. Corp.</u>, 2008 WL 5539688, at *3 (S.D.N.Y.
2008) (applying 70% reduction for vagueness, block billing,
excessive hours billed).  Thus, I grant plaintiffs attorneys'
fees in the amount of $187,570.80 ($300 per hour x (1812.19 hours
- 249.1 hours) x 40%).  Given my concerns as to the accuracy of
the time records, this amount of fees is appropriate for the work
by counsel in this case and provides more than adequate
compensation to counsel.

In addition to reductions for excessive billing, defendant
further argues for a downward adjustment in the lodestar based on
the plaintiffs' degree of success.  A court may not reduce an

attorneys' fee award simply because the fee award would be disproportionate to the damages awarded. See Millea, 658 F.3d at 169. Although defendant is correct that the degree of success is "the most critical factor" in arriving at a reasonable attorneys' fee, this is not a case where plaintiff achieved only a technical or de minimis victory. On the contrary, plaintiffs received tangible benefits as a result of this litigation. They were returned to their position as bus drivers and are now permitted to wear khimars without covering them with a hat or attaching any logo, as the defendant had originally demanded. In addition, plaintiffs collectively received monetary relief of almost $100,000. Although defendant argues that the non-monetary relief was attributable solely to the efforts of the United States, plaintiffs' counsel collaborated with the government's attorneys from the outset of their participation and conducted discovery for more than a year, upon which the United States relied in opposing defendant's summary judgment motion. Thus, I will not apply a downward adjustment for plaintiff's degree of success.

C.   Costs

In addition to attorneys' fees, plaintiffs are entitled to "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998). Plaintiffs seek costs in the amount of $3,037.

Specifically, defendant disputes two of the expenses charged

by plaintiff, i.e., $1,500 for Dr. McCloud's expert fee and $87.00 for purchase of the books discussed above regarding the attire of Muslim women. Consistent with the discussion of attorneys' fees relating to these items, I deny reimbursement for the books and Dr. McCloud's expert fee. Plaintiff has not established that either disbursement was reasonably expended. Plaintiff's remaining costs of $150 for the court filing fee, $800 for a mediator and $500 for a medical examination of plaintiffs are reasonable and recoverable. Therefore, plaintiffs are awarded $1,450 in costs.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiffs motion for attorneys' fees is granted in the amount of $187,570.80 and costs in the amount of $1,450.

**SO ORDERED.**

Dated:     Brooklyn, New York
           March 25, 2014

                              _____/s/_____
                              MARILYN D. GO
                              UNITED STATES MAGISTRATE JUDGE